MARY McKITTRICK MARKHAM, Appellant, v. HARGADINE-McKITTRICK DRY GOODS COMPANY.—19 S. W. (2d) 281.

HILDEGARDE STERLING McKITTRICK, Appellant, v. HARGADINE-McKITTRICK DRY GOODS COMPANY.—19 S. W. (2d) 281.

Division One, May 18, 1929.

*Fordyce, Holliday & White* for appellants.

*Christian F. Schneider* and *Charles P. Williams* for respondent.

*Fordyce, Holliday & White*, for appellants in reply.

ELLISON, C.—The two plaintiffs severally appeal from an adverse judgment on their consolidated suits. The causes were tried to the court below, a jury being waived. Each is an action in general assumpsit. The appellant Mary McKittrick Markham sues for $100,000, and the appellant Hildegarde Sterling McKittrick for $15,000.

In February, 1913, they subscribed and paid these amounts respectively, for common stock of a corporation known in the record as the "Building Company," which built the Railway Exchange Building in St. Louis. The subscriptions were made at the request of the respondent Dry Goods Company under an agreement that it would at any time on demand take the stock off appellants' hands and issue to them in exchange therefor an equal amount of its own debenture notes due in five years. Payment of these debentures, in case of liquidation of the Dry Goods Company, was to be subordinated to the claims of all other creditors and the notes were to share ratably with its first preferred stock. The notes were to bear six per cent interest, but this was to be payable only subject to and after payment of dividends on the first preferred stock.

The stock of the Building Company was never issued to the appellants, and was never tendered by them to the respondent Dry Goods Company to be exchanged for the debenture notes. The debenture notes were never issued to them. In 1915 the Dry Goods Company went into liquidation. These suits were instituted in January, 1918. In these circumstances the appellants contend they are entitled to recover back from the Dry Goods Company the amount of their subscriptions to the common stock of the Building Company. The foregoing summarizes the issues of fact—not very satisfactorily, it is true, but as well as may be done in a preliminary way. We proceed to a further statement of the case.

During the times here involved the respondent Hargadine-McKittrick Dry Goods Company was a Missouri corporation engaged in the wholesale dry goods business in St. Louis. The leading stockholders, it seems, were the members of the McKittrick family. Mr. Thomas H. McKittrick was president and Messrs. Ralph, Hugh and

Walter McKittrick were vice-presidents. The appellant Mary McKittrick Markham is their sister. The appellant Hildegarde Sterling McKittrick is the wife of Thomas H. McKittrick.

In about 1911 the respondent Dry Goods Company owned all the corporate stock of the Wm. Barr Dry Goods Company, a retail concern, and had also acquired certain leases running approximately ninety years, covering City Block No. 128 in St. Louis, known as the "Barr Block." It was planned to erect a large store and office building thereon, to be called the Railway Exchange Building. The seven lower floors and basement were to be leased to the May Department Stores Company, and the latter was also to purchase from respondent the Barr Dry Goods Company, as we understand. Further, about seven floors were to be leased to various railroad corporations for general offices. The agreement with the May Company fixed December 1, 1911, as a time limit for the completion of financing plans for the building, and that date was at hand when the story in this case starts.

Mr. Thomas McKittrick had made efforts through the year 1911 to raise the necessary money in Chicago and New York. Failing in these, owing to the pressure of time, he turned the matter over to a syndicate organized through the St. Louis Union Trust Company or some of its officers. Difficulties were still encountered, and finally it was determined by the syndicate that the McKittrick family would have to put up $300,000 cash for that much of the $2,000,000 common stock of the new Building Company. The balance of the common stock was to go to the respondent Dry Goods Company in exchange for the ninety years' ground leases, etc. The details of the promotion scheme are set out in a syndicate agreement dated November 11, 1911, and a supplemental agreement dated November 22, 1911, covering twenty pages of the printed record. The situation was serious. If the project was not consummated the respondent Dry Goods Company would be left loaded down with heavy stagnant investments in the Barr Company and the leases, facing liquidation; and it was unable to spare from its working capital the $300,000 cash necessary to carry out the syndicate arrangement.

The members of the McKittrick family held a conference and canvassed their resources. They concluded they could raise the money, but were unwilling to invest unconditionally and outright in the common stock of the Building Company. What they wanted was to pay the money to the Dry Goods Company and have the latter subscribe for the Building Company stock, they taking back from the Dry Goods Company its own first preferred stock. But this would have necessitated an increased issue of the preferred stock, which, in turn, would have required legal action, delay, stockholders' meetings, publication of notices, etc. So the plan was adopted of their

subscribing direct for the Building Company stock, exchangeable at their option for debentures of the Dry Goods Company conditioned as hereinbefore recited. On November 24, 1911, a meeting of the full *board of directors* of the respondent Dry Goods Company was held. At that meeting resolutions were unanimously adopted declaring that an emergency existed such as required immediate corporate action without waiting to submit the matter to the stockholders; and formally authorizing the foregoing arrangement.

The appellant Mary McKittrick Markham contributed $100,000 to the $300,000 fund raised for the purpose recited in the preceding paragraphs, and the appellant Hildegarde Sterling McKittrick $15,000, both at the request of Thomas H. McKittrick, who was brother of the former and husband of the latter. Both appellants knew there was a crisis in the affairs of the respondent Dry Goods Company, in which the McKittrick family were heavy stockholders, and both left the handling of the matter entirely to Thomas H. McKittrick without paying attention to the details and without much knowledge of them.

The St. Louis Union Trust Company was financial agent and trustee for the Building Company syndicate. On November 25, 1911—the day following the meeting of the board of directors of the respondent Dry Goods Company—the appellant Mrs. Markham went to the Trust Company's office and placed in its hands $100,000 in securities, taking back from it a receipt stating that the Trust Company might sell the securities and out of the proceeds pay her $100,000 subscription for common stock of the Building Company. At the same time and place she took back also a receipt from the respondent Dry Goods Company setting out the terms on which she was making the subscription. This recital was as follows:

"Now by this agreement by and between the Hargadine-McKittrick Dry Goods Company and Mary McK. Markham, said Dry Goods Company agrees that it will at any time upon demand of Mary McK. Markham or her successor in interest, and upon tender to it of certificates of stock in said Building Company for $100,000 face value, endorsed for transfer, issue to her in exchange for said stock certificates, the debenture note of the Dry Goods Company as above described; in collateral form and secured by a deposit of said certificates and of such additional securities as the board may determine."

The debenture note as earlier described in the receipt was to be for:

"$100,000 payable five years after its date drawing interest at the rate of six per cent per annum (payable only after dividends upon the first preferred stock) and so worded that upon liquidation of said Dry Goods Company the payment of said note will be subordinated to the claims of all other creditors and will share ratably with the first preferred stock."

In December, 1912, Mrs. Markham was permitted to sell part of the deposited securities, at which time she paid $50,000 on her $100,-000 stock subscription, and in February, 1913, she sold the remaining securities and paid the balance of her subscription. The appellant Hildegarde Sterling McKittrick paid her stock subscription of $15,-000 in cash at the outset on November 25, 1911, on the same terms and conditions, and the Trust Company issued its receipt therefor.

During the year 1913 dissension arose among the stockholders of the Dry Goods Company. A certain group of them contended they had been induced to subscribe for bonds of the Building Company on the representation that the McKittrick family was taking $300,-000 of the common stock, and they very seriously objected when they learned the board of directors of the Dry Goods Company had protected the family against that subscription by agreeing to exchange debentures therefor. Also, the Dry Goods Company had agreed to subscribe for as much as $300,000 of the bonds of the Building Company, and the latter was proposing to increase its aggregate bond issue $500,000, which the dissenting stockholders of the Dry Goods Company thought would prejudicially affect the value of the bonds. Also, some of the railroad corporations which had intended to lease space in the Railway Exchange Building were demanding that they be indemnified against liability on their cancelled leases in other buildings. All these matters gave rise to disputes which threatened litigation.

On December 11, 1913, a large number of the stockholders of the Dry Goods Company signed a contract whereby they attempted to compose their differences growing out of the above matters. The gist of the agreement was that Mr. Walter McKittrick, one of the members of the McKittrick family, personally would take over from the dissenting stockholders, at cost plus interest, the bonds of the Building Company for which they had subscribed, and they, in turn, were to waive their objections on the points mentioned above, save as to the debentures. With respect to these, it was provided in the contract that the holders of debenture rights (being the members of the McKittrick family or their assigns) should surrender their receipts calling therefor, to the Mercantile Trust Company as trustee; and on certain stipulated conditions all or a part of the debentures were to be cancelled and other obligations of the Dry Goods Company of lower rank substituted in their stead. This part of the contract, it seems, was contingent on the signing of the agreement by all the stockholders.

It appears that both appellants joined in this contract and assigned their debenture receipts to the Mercantile Trust Company as provided therein; and the appellant Mrs. Markham further served notice on the Dry Goods Company that when she received her $100,-

000 in common stock of the Building Company she would demand the issuance of debentures in exchange therefor. But the contract was never signed by all the stockholders and was not carried out so far as affected the appellants' debenture rights.

Thereafter in December, 1914, an effort was made to avert financial disaster, apparently, by revamping the corporate organization of the Dry Goods Company. The second preferred and common stock were reduced, an existing voting trust cancelled, and certain dividends were waived by holders of the first and second preferred stock, but in spite of it all the company went into liquidation in March, 1915, and was when these suits were originally filed in 1918, and at the time of trial in October, 1924.

Throughout this whole period the appellants admit they had not, and have not yet, procured the issuance to them of the common stock in the Building Company for which they subscribed, and that they had not and have not tendered this stock to the Dry Goods Company and demanded issuance of the debentures in exchange therefor. Indeed, we do not find any evidence in the record that they have ever demanded issuance of the debentures on any terms or conditions, with or without tendering the stock in the Building Company. Neither is there any evidence that the Dry Goods Company has ever refused to issue the debentures, or that it would have refused if a demand had been made. The only evidence on the point is that some of the Dry Goods Company stockholders protested against the issuance of the debentures and threatened litigation; but there is nothing to show that was the attitude of the *corporation*.

As regards the common stock in the Building Company, the record fails to show the appellants ever demanded the stock or tried to get it; or that the Building Company or syndicate managers ever refused to issue it to them; or that the appellants would have been met with such a refusal if demand had been made; or that the Dry Goods Company in any way connived with the Building Company or the syndicate managers to prevent the issuance of the stock. On this point, the appellants put on the stand, as their own witness, one of the syndicate managers, Mr. Robert McKittrick Jones. He said:

"I am not aware of any stock in the Railway Exchange Building Company that was ever issued to Mrs. Markham. The syndicate managers, to my knowledge, never gave anything to Mrs. Markham for her $100,000 except those receipts [referring to certain receipts mentioned elsewhere in the record].

"I have no recollection whatever of why this stock was not given her. The stock was all held by the syndicate managers. It is still held by them. No stock has ever been issued to anyone except the directors, who were issued qualifying shares. . . . I am not aware of any breach of any obligation that the syndicate man-

agers may have been guilty of which they assumed. As far as I know they have complied with all their agreements, as the same were modified from time to time.''

I. Under these facts we do not see how the judgment of the circuit court could have been otherwise than as it was, viz., against the appellants. Their general theory of the case is that they put up their respective subscriptions of $100,000 and $15,000 at the request of the respondent and for its benefit, on the assurance and agreement that they would receive therefor a like amount of common stock in the Building Company which they might, at their option, exchange for debentures of the Dry Goods Company, conditioned as hereinbefore recited. They say this agreement was never carried out and that they are therefore entitled to have their money refunded with interest; and that the money should come from the party at whose instance they paid it in—the Dry Goods Company. But why, and whose fault was it that the contract was not carried out? Or may it not still be carried out? This is the nub of the case, as we see it.

To entitle them to a return of their money the appellants must show a discharge of the contract in some way such as leaves them free to disregard it. [2 R. C. L. 761, sec. 21.] We find no evidence of this kind in the record. The appellants contend the Dry Goods Company was at fault because certain of its stockholders objected to performance of the contract; and because a few of the stockholders refused to sign the compromise agreement of December 11, 1913, whereunder the appellants deposited their syndicate receipts calling for common stock in the Building Company with the Mercantile Trust Company, as trustee, on such terms that the Dry Goods Company could have procured the issuance of the Building Company stock and could have exchanged therefor its debentures or securities of a lower grade—if all the stockholders had signed their contract and consented.

We are not sure that we understand this reasoning. Appellants do not explain how or why proof that some of the stockholders objected to performance of the contract is any evidence that the Dry Goods Company as a corporation failed to carry it out, or would have so failed if performance had been demanded. Neither can we see anything in the point that a few of the stockholders refuse to sign the agreement of December 11, 1913, and thereby thwarted the arrangement under which the appellants, by a compromise, would have got securities of a different class in exchange for their Building Company stock. This had nothing to do with the original contract, but was a substitute for it; and as this compromise contract was never executed by all the stockholders and fell through, it is out of the case.

The undisputed evidence is that the appellants have failed to perform their stock subscription contract on their side. They have never procured from the Building Company the common stock for which they subscribed. They have never tendered to the Dry Goods Company certificates for that stock, properly endorsed, and demanded the issuance to them of debentures in exchange therefor. There is nothing in the record so far as we can see, to show that if they had taken these steps, or if they should still take them, they could not get exactly what they bargained for. This being so, they cannot disavow their own contract and sue for a return of their money.

In their supplemental brief the appellants make another suggestion. They say that under the terms of their contract with the Dry Goods Company the latter agreed to *cause* the Building Company or the syndicate managers to issue to them the shares of stock for which they subscribed; that the Building Company or the syndicate, was really the *agent* of the Dry Goods Company, so far as pertained to the issuance of the stock and the receipt of their money. We do not think this is so. The appellants, themselves, were to procure the issuance of their stock in the Building Company, and might keep it or exchange it for debentures at their own pleasure and option; and the syndicate was not an agent, but acted independently, and dealt with the Dry Goods Company and other stockholders at arm's length in organizing the Building Company corporation. But however that may be, there is no evidence the Building Company or the syndicate managers have ever withheld from appellants the common stock for which they subscribed, or that the contract has not been performed for that reason.

To sum up the whole matter, we find nothing in the evidence which would warrant us in overturning the judgment of the trial court. In so deciding we allow to appellants their legal contention that the action should be adjudged along equitable lines. This makes it unnecessary to go into the technical questions which have been ably briefed by appellants' counsel.

The judgment is affirmed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur, except *Frank J.,* not sitting.